UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERRENCE CHARLES ROBINSON,

       Plaintiff,

    v.

NANCY A. BERRYHILL,

       Defendant.

Case No. 16-cv-02537-JCS

**ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 19, 22

## I.    INTRODUCTION

Plaintiff Terrence Charles Robinson brings this action appealing the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (the "Commissioner"), denying Robinson's application for disability benefits. The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5. For the reasons discussed below, Robinson's motion is GRANTED in part, the Commissioner's motion is DENIED, and the matter is REMANDED to the Commissioner for further administrative proceedings.[1]

## II.    BACKGROUND

### A.    Medical Records[2]

Robinson was abandoned by his mother from the ages of 11 through 18 and lived with an aunt who physically abused him. Administrative Record ("AR," dkt. 16) at 589. He ran away to group home and completed high school and some junior college. *Id.* In 2009, at the age of 33, he had not held a steady job in ten years. *Id.* Robinson has a history of hepatitis C (generally asymptomatic) and AIDS with a low CD4 count, having been diagnosed with HIV in 2000, as

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

[2] This summary focuses on the treatment records cited by the ALJ and the parties. It is not intended as a complete recitation of Robinson's medical history.

well as a history of heroin use.  *Id.* at 357, 578.

A report from an office visit in early 2009 indicates that Robinson's HIV was asymptomatic at that time and he had not "ma[de] any interval care visits," but that he was interested in treatment. *Id.* at 578. Robinson spent a night at a hospital in July of 2009 "for observation for suicidality while intoxicated." *Id.* at 581, 584. He admitted to not having picked up a prescription after his previous appointment but stated that he was motivated to proceed with treatment for his HIV. *Id.* at 581. In September of 2009, Robinson visited urgent care for stomach pain; notes indicate that he was "not taking medication" and "seem[ed] to be emotionally unstable." *Id.* at 585–86. By November, he was residing at a sober living facility and stated that he had been sober since September. *Id.* at 592.

Robinson was admitted at Highland Hospital in June of 2011 with symptoms including facial swelling and fever. *Id.* at 357. After being discharged, he did not complete his course of antibiotics and did not appear for his follow-up appointment. *Id.*

Several months later, he began experiencing facial swelling again and took the remainder of his leftover antibiotics, but the swelling and pain worsened and he developed a "cough with white sputum." *Id.* Robinson was admitted to Highland Hospital again in February of 2012 and remained at the hospital until discharged on March 21, 2012. *Id.* at 357; 545. He was diagnosed and treated for bacterial endocarditis, with conditions including a facial abscess, multiple bacterial infections, septic emboli, tachycardia, spiking fever, and dental caries requiring removal of eleven teeth. *Id.* at 357–58. An early examination noted "[a]cute and chronic paranasal sinusitis," and a post-operative note lists Robinson's pre-operative diagnosis as including "mild parasinusitis." *Id.* at 381, 392. Robinson's abscess and infections resolved after weeks of treatment with antibiotics, including intravenous treatment. *Id.* Robinson complained of depression and anhedonia during his time at the hospital and was restarted on an antidepressant that he had taken previously. *Id.* at 358.

In July of 2012 Robinson visited Highland Hospital for bilateral leg edema and pain. *Id.* at 528. He reported that he had not used heroin intravenously for "a couple of years" and was "only snorting heroin occasionally now." *Id.* A doctor at the emergency department treated him for

cellulitis, a bacterial infection.  *Id.* at 529.  Reports from this visit indicate that Robinson had been admitted to the Eden Medical Center one week earlier, *id.* at 528, but the administrative record does not appear to include any records from that hospital.

On August 25, 2012, Robinson visited Dr. Kyle Van Gaasbeek, Psy.D., complaining of bipolar disorder and attributing his depression to AIDS.  *Id.* at 493.  Robinson told Dr. Van Gaasbeek that heroin had been "his drug of choice" for more than ten years through the present, that he had "also experimented with cocaine," and that he had been clean for two weeks at that time.  *Id.* at 494.  Dr. Van Gaasbeek determined that Robinson exhibited some degree of impairment as to memory, concentration, and calculation, and diagnosed him with "Depressive disorder not otherwise specified" and opioid dependence, opining that Robinson's "problem is treatable" but that he might continue to experience depression as a result of AIDS.  *Id.* at 494–95.  In a functional assessment, Dr. Van Gaasbeek assessed Robinson as unimpaired with respect to performing simple and repetitive tasks, accepting instructions from supervisors, and performing work activities consistently without special instruction, mildly impaired with respect to performing complex tasks, mildly to moderately impaired with respect to interacting with coworkers and the public, maintaining regular attendance, and completing a normal workday without interruption, and moderately impaired with respect to his ability to deal with the usual stress encountered in the workplace.  *Id.* at 496.

On August 30, 2012, Robinson visited Dr. Robert Tang, M.D., for a physical evaluation.  *Id.* at 497–500.  Dr. Tang described Robinson as "clean three years off IV drug use" with "off and on current marijuana" use and "moderate" alcohol use, noting that Robinson "[o]nly once got drunk in the past year."  *Id.* at 497.  Dr. Tang noted Robinson's history of AIDS complications but stated that he had at that time "fully recovered and resumed his normal activities of daily living," and assessed no limitations in various categories of physical functional assessment, including standing, walking, and sitting.  *Id.* at 499–500.

In early November of 2012, Robinson was treated in the intensive care unit for angioedema (facial swelling) requiring sedation and intubation because he had difficulty breathing.  *Id.* at 525–26; 543–44.  He was admitted on November 5 and discharged November 8.  *Id.* at 543.  Records

from that hospital visit indicate that Robinson's medical history included a sinus abscess and endocarditis. *Id.* at 525.

In December of 2012, Robinson saw Dr. Richard Murdoch at the Fairmont Adult Immunology Clinic. *Id.* at 828. Robinson had not adhered to his HIV medication and his CD4 count was zero. *Id.* He was drinking and using drugs, and expressed interest in a detox program. *Id.* Dr. Murdoch described Robinson as "disheveled" with speech that was "pressured, difficult to interpret and redirect," determined that he likely had bipolar affective disorder or possibly post-traumatic stress disorder, and suggested that Depakote might be appropriate as a mood stabilizer. *Id.*

In February and March of 2013, Robinson presented to Highland Hospital multiple times with worsening skin ulcers on his face, chest, arms, and back, and along his lymphatic tract. *Id.* at 534, 541. He was admitted February 21 and discharged February 28, and admitted again on March 9 and discharged March 10. *Id.* at 539, 541. After a preliminary diagnosis of "no evidence of fungal infection," tests revealed "innumerable microbes" consisting of "yeast and hyphae (or pseudohyphae)," resulting in a differential diagnosis including "invasive candidiasis and aspergillosis, among other considerations." *Id.* at 534. Later in March, after Robinson had been discharged, Dr. Murdoch saw him at the Fairmont clinic, observed worsening rash with ulcerated lesions and inability to eat solid food, and had him readmitted at Highland, where a biopsy of a skin lesion produced results consistent with a fungal infection, with stains showing "yeast-like microorganisms." *Id.* at 533, 822. Notes indicate that those findings were "similar to those seen in [Robinson's] recent skin biopsy." *Id.* at 533.

Robinson was admitted again to Highland on March 15, 2013 with skin ulcers "consistent with fungal infection from sporotrichosis" and remained at the hospital into April. *Id.* at 537, 551. "[M]ultiple skin biopsies" revealed "variably sized yeast, which has now been identified as sporotrichosis schenkii per the primary team." *Id.* at 552. CT scans showed "atypical inflammatory disease in the right upper lobe with septic emboli." *Id.* Robinson's discharge summary states that his "skin ulcers secondary to sporotrichosis" were "not improving with current medication." *Id.* at 537.

4

Robinson started on Itraconazole antifungal medication after his discharge from Highland Hospital but ran out after a few days and saw an increase in swelling and pain from lesions. *Id.* at 820. When Robinson visited the Fairmont clinic on April 26, 2013, Dr. Murdoch noted that his sporotrichosis had recurred and he had new abscesses possibly resulting from a staph infection. *Id.* Robinson's CD4 count was improving on HIV medication. *Id.*

The report from a follow-up visit to the Fairmont clinic on May 3, 2013, indicates that Robinson's "overlying cellulitis . . . appear[ed] largely better" after treatment with antibiotics. *Id.* at 818. He nevertheless had many lesions or abscesses of up to three centimeters on his arms, back, legs, and face that were draining spontaneously and were at times painful. *Id.* Dr. Richard Murdoch concluded his assessment as follows: "Lesions continue to evolve, now many, many pustular lesions and not certain whether this represent [sic] SA superinfection or just evolution of the existing fungal lesions. Plan on fungal, bacterial cultures." *Id.*

Robinson visited the clinic in June of 2013 having run out of his antifungal medications for reasons that were not clear to Dr. Murdoch, although he reported that he was taking HIV medication as directed. *Id.* at 816. Nodules on Robinson's chest and arms had increased in size. *Id.* Dr. Murdoch emphasized the importance of Robinson taking his antifungal medication. *Id.* Notes from a July 2013 clinic visit indicate that while Robinson's lesions had worsened after he ran out of medication, they were at that time decreasing in size, although he had some ulcerations. *Id.* at 814. Due to "pill burden" Robinson had not been taking Depakote, a medication for bipolar disorder, and Dr. Murdoch advised that he restart it. *Id.*

After a visit to the clinic on August 9, 2013, Dr. Murdoch noted that edema of Robinson's left upper extremity "happened in hospital and got better," and that an abscess on Robinson's left triceps was "most likely sterile related to sporothrix infection" and was drained that day. *Id.* at 812. Robinson was "[d]oing OK with HIV medication" with "no missed doses today," and his lesions had "regressed after starting the [antifungal] medication again." *Id.* Dr. Murdoch's assessment called for "indefinate [sic] therapy" of antifungal medication for Robinson's sporotrichosis. *Id.*

Dr. Murdoch saw Robinson again at the Fairmont clinic on November 1, 2013, at which

time Robinson had "[f]allen out of care and out of antifungals for several weeks," and although he had previously "almost all healed," his condition at this point had deteriorated and he had lesions on his face, trunk, and extremities. *Id.* at 810. Robinson was referred to the emergency department where he was supposed to be admitted but was instead sent home. *Id.* at 808. Two weeks later, after blood cultures revealed a staph infection and Robinson continued to experience pain and other symptoms even after resuming his antifungal medication, he returned to the clinic and Dr. Murdoch admitted him directly to the hospital. *Id.*

Robinson was admitted to Highland Hospital from November 15 through 26 of 2013 based on Dr. Murdoch's determination "that the swelling of his digit and lower extremities and skin lesions were worsening." *Id.* at 646. Doctors suspected "[o]steomyelitis secondary to bacteremia or fungal infection" but results of tests were largely negative or inconclusive. *Id.* at 646–47. Robinson's lesions worsened despite intravenous medication. *Id.* at 646. Notes indicate that Robinson "admi[tted] he has been non-compliant with medication in the past," and that Robinson "is a former IV heroin user and now smokes the substance." *Id.* at 647. Results of an inquiry from the infectious disease department as to Robinson's "HIV typing and sensitivity testing to determine effectiveness of his HAART medication" were "still pending" due to his noncompliance. *Id.*

Robinson appeared well at a January 31, 2014 visit to the Fairmont clinic. *Id.* at 806. Dr. Murdoch noted that he had no facial lesions and his skin was healing, but he still had "some larger papular lesions." *Id.*

Robinson was admitted on June 13 or 14, 2014 and remained in the hospital until June 23. *Id.* at 674–730. He was referred from the Fairmont clinic, where Dr. Murdoch noted that Robinson had not been taking his HIV medication reliably and assessed "recurrent aspergillosis with a question of superinfection of open wounds." *Id.* at 804. Doctors considered the possibilities of bacterial infection and sporotrichosis. *E.g.*, *id.* at 703–05, 730. Robinson required general anesthesia and surgical collection of biopsies and cultures from his knee and finger. *Id.* at 691. At least one culture was identified as Sporothrix schenckii, *id.* at 686–88, but Robinson's discharge summary indicates that doctors found "no fungal organisms" in his infected finger, *id.* at

776. Although Robinson's sporotrichosis was characterized as "stable," the discharge summary notes that he "found difficulty complying with [his antifungal] medication regimen when he was at home," and that he should be on that medication for life. *Id.* at 785. One record from that hospital admission indicates that doctors considered amputating Robinson's infected finger but determined that amputation would be "a little tricky" and "might not get all of the infected area" because Robinson's infection extended to the joint of the finger and he had "numerous lesions on the left arm from the disseminated sporotrichosis." *Id.* at 766. Another record indicates that Robinson had a history of "disseminated aspergillosis." *Id.* at 804. Robinson was "typically" injecting heroin into his lower extremities at that time. *Id.* at 766.

Robinson was admitted again on August 1, 2014 for facial swelling and pain after a shaving cut led to swelling and "ulcer expressing yellowish pus." *Id.* at 738, 755–56; *see also id.* at 802 (indicating that Robinson was referred to the emergency department from the Fairmont clinic). He was on methadone at that time for his heroin addiction. *Id.* at 738. It is not obvious from the record when Robinson was released from this hospital admission, but records show him receiving treatment through at least August 4, and dressing changes were scheduled on August 8, 15, and 22. *Id.* at 754, 760.

**B.    Consulting Medical Opinions and Administrative Applications**

In reports prepared for Robinson's initial disability application, state agency consulting physicians determined that he had the following severe impairments: (1) HIV; (2) multiple or recurrent bacterial infections secondary to HIV; (3) affective disorders; and (4) substance addiction disorders. AR at 79. On September 18, 2012, Dr. Mario Morando, MD assessed Robinson as having mild restrictions in activities of daily living, moderate restrictions in social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. *Id.* at 80. Among other limitations, Dr. Morando wrote that Robinson would be "moderately limited" in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.* at 83. On September 20, 2012, Dr. J. Bradus, MD assessed some exertional limitations and determined that

Robinson was "able to do less than full light work." *Id.* at 82. Dr. Bradus wrote that Robinson was hospitalized in June of 2011 and June of 2012, and thus "hosp[italized] for 2 bacterial infections within 12 mos." *Id.*[3] On his initial application, Robinson was found not disabled and capable of performing sedentary work, including as an "Adresser," "Nut Sorter," or "Cuff Folder." *Id.* at 85.

In response to Robinson's request for reconsideration, consulting physician Dr. C. Friedman, MD reached substantially the same conclusions as Dr. Bradus and used the same description of Robinson's history of hospitalizations, in a report dated March 11, 2013. *Id.* at 95–96. Dr. Friedman does not appear to have been aware of Robinson's hospitalizations in July and November of 2012, or in February and March of 2013. *See id.*; *cf. id.* at 528, 539, 541, 543. In reports dated March 12, 2013, Dr. R. Singh, MD reached substantially the same conclusions as Dr. Morando as to Robinson's mental impairments. *Id.* at 93–94, 96–98. Robinson was once again found to be capable of sedentary work and not disabled. *Id.* at 99.

### C.  Administrative Hearing

The ALJ held a hearing on September 18, 2014. AR at 21, 37–72. Robinson attempted to appear in person but was not permitted to enter the federal building in Oakland, California because he did not have valid identification. *Id.* at 21, 37. Robinson's counsel requested a continuance to allow Robinson to obtain identification and testify in person, but the ALJ declined to continue the hearing "because there's no guarantee that there's going to be an ID," and Robinson instead testified by telephone. *Id.*

The ALJ began the hearing by allowing Robinson's attorney Michael Wolchansky to summarize the arguments submitted in his brief. *Id.* at 39; *see also id.* 340–46 (Robinson's pre-hearing brief). Wolchansky argued that Robinson satisfied the then-current[4] Listing 14.08,

---

[3] The administrative record does not appear to include any other evidence that Robinson was hospitalized in June of 2012. Dr. Bradus's description of Robinson's treatment during the purported June hospitalization is consistent with Robinson's hospitalization in February and March of 2012, so it is possible that he made a mistake as to the date. *See* AR at 82, 357–58. Dr. Bradus does not appear to have been aware of Robinson's July 2012 hospitalization—or alternatively, if he intended to refer to that hospitalization, he may not have been aware of the February and March hospitalization. *See* AR at 528.

[4] Subsequent amendments have since restructured how the Listing of Impairments addresses

8

governing HIV infection, and specifically discussed fungal infection under 14.08(B), skin conditions under 14.08(F), other specific infections under 14.08(J), and other manifestations of HIV infection under 14.08(K). *Id.* at 39. Wolchansky also argued that Robinson retained no residual functional capacity because he would need to miss work often and risked infection in a workplace, that there was no medical evidence suggesting his past drug use is material to his disability, and that at the time of the hearing Robinson had a CD4 count of about 12 and a viral load of about 10,000. *Id.* at 39–40.

The ALJ questioned Robinson about his living circumstances, and Robinson testified that he lived with a friend who serves as his caretaker. *Id.* at 40–41. Robinson testified that he was not currently working and that his infections, pain, and breathing issues would prevent him from working consistently. *Id.* at 41. The ALJ asked if Robinson was receiving treatment for his HIV, and Robinson responded that he was treated at Highland Hospital by Dr. Murdoch, but that Dr. Murdoch had recently left the hospital and Robinson had an appointment with a Dr. Elerstein, whom he had not yet seen. *Id.* at 42. Responding to a question about what treatment he received for his HIV, Robinson listed a number of medications he was taking, including HIV medication and antifungal medication. *Id.* The ALJ asked no further questions of Robinson and turned the hearing over to Wolchansky, Robinson's attorney. *Id.*

In response to questions from Wolchansky, Robinson testified that he was currently feeling depressed, and had experienced depression continuously since living in foster homes and group homes as a child, although his HIV and AIDS were the largest factor currently contributing to his depression. *Id.* at 43–44. "[M]ostly all of the time," Robinson feels "rattled up," experiencing anxiety and difficulty following through on tasks. *Id.* at 44, 47–48. He had previously enjoyed playing basketball and interacting with people, but he testified that he had lost interest in the things he used to enjoy and now feels left out and like he does not belong. *Id.* at 45–46. He experienced difficulty sleeping, no longer had his previous appetite and energy, and had feelings of guilt and worthlessness. *Id.* at 46–47. Robinson testified that he had considered killing himself

immune disorders.

when he was younger and still has suicidal thoughts "[s]ome days," but now wanted to be positive and received support from people around him. *Id.* at 48.

Robinson reported that he had most recently been to the hospital about a month and a half before the hearing, for fungal and bacterial infections on his face. *Id.* at 49. He had previously had biopsies taken at the hospital from his knee and his finger. *Id.* Wolchansky told the ALJ that he had difficulty obtaining certain of Robinson's records from Highland Hospital, and the ALJ agreed to keep the record open for a month after the hearing to allow Wolchansky to submit those records. *Id.* at 50–51.

In response to questions from Wolchansky, Robinson testified that his TC4 count was "less than 10 or 12" the last time he visited the hospital. *Id.* at 51. Robinson testified that at the time of the hearing, he had painful sores the size of a quarter on his face, arms, and fingers, including open sores on his face, that he had to be careful about scratching them due to the risk of bacterial infection, and that despite medication, his sores come and go but "almost never [heal] all the way." *Id.* at 52–54. To avoid infection, Robinson only left the house about once a day, which was less often than he used to, and he limited how often he shaved. *Id.* at 54–55. His housemate did his laundry and grocery shopping, although Robinson sometimes went with her to help with shopping. *Id.* at 55–56. Robinson isolated himself, did not spend time with people anymore, and had trouble with his memory. *Id.* at 56–57. He had difficulty walking and could only walk two or three blocks or climb five steps before losing his breath and needing to rest. *Id.* at 57–58, 60–62. He testified that he could only sit for a couple of minutes at a time before he would start pacing. *Id.* at 62–63. He could only stand for twenty minutes at a time, and kept a chair close by so that he could sit when he became tired. *Id.* at 64. After taking his medication, he would feel drowsy and would sometimes lie down. *Id.* at 63–64. Robinson testified that he could lift a gallon of milk but could not lift a grocery bag containing milk and other items. *Id.* at 64–65.

Robinson took ibuprofen for pain, which "helps a little," and sometimes smoked marijuana (most recently one week before the hearing), which helped with his appetite and with pain. *Id.* at 59, 66. He had most recently used heroin "a couple weeks" before the hearing. *Id.* at 59. He testified that heroin sometimes helped with his pain but "might have messed [him] up a little more

10

1    too," so on balance he did not feel that it helped him. *Id.* at 67.

2        After Robinson's testimony, the ALJ questioned vocational expert Jeffrey Malmuth (the

3    "VE"). *Id.* at 67–69. The ALJ first presented the hypothetical scenario of someone with

4    Robinson's age, education, and work experience, who was limited to light, simple, and routine

5    work with up to four hours of standing and walking and no more than occasional contact with

6    coworkers and the public. *Id.* at 68. The VE testified that such a person could work in a number

7    of jobs that are relatively common in both California and the United States as a whole, and

8    estimated that number of suitable positions in those fields would be reduced by twenty-five

9    percent based on the restrictions related to standing and walking. *Id.* at 68–69. The ALJ's second

10   hypothetical described an individual who could sit for only two hours in a workday and stand and

11   walk for only two hours in a workday, and the VE testified that there would be no jobs available

12   for such a person. *Id.* at 69.

13       Wolchansky asked the VE whether someone meeting the ALJ's first hypothetical could

14   find work if required to miss work for a month at a time, or two weeks at a time, and the VE

15   testified that there would be no jobs available under either scenario. *Id.* at 70. As for whether

16   someone meeting the first hypothetical could miss one week of work at a time, three times per

17   year, the VE initially stated that he "d[id]n't believe so," but went on to testify that such absences

18   "would probably be tolerated initially" as not greatly exceeding standard vacation and sick-day

19   policies. *Id.* Wolchansky also asked if there would be jobs available for someone meeting the

20   ALJ's first hypothetical who "was not able to be exposed to any fumes, gases, [and] would need to

21   work in a sterile workplace," and the VE testified that no such jobs would be available. *Id.* at 71.

22   Finally, Wolchansky attempted to ask the VE if the physical disfigurement of having sores on a

23   person's face and body would prevent that person from working, but the ALJ did not allow that

24   line of questioning "because that goes to getting a job, not the hypotheticals that we're dealing

25   with at Social Security." *Id.* at 71–72.

26       **D.    Regulatory Framework for Determining Disability**

27           **1.    Five-Step Evaluation Process**

28       The Commissioner uses a "five-step sequential evaluation process" to determine if a

claimant is disabled. 20 C.F.R. § 404.1520(a)(4). At step one, the Administrative Law Judge ("ALJ") must determine if the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If so, the ALJ determines that the claimant is not disabled and the evaluation process stops. If the claimant is not engaged in substantial gainful activity, then the ALJ proceeds to step two.

At step two, the ALJ must determine if the claimant has a "severe" medically determinable impairment. An impairment is "severe" when it "significantly limits [a person's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a "severe" impairment, then the ALJ will find that the claimant is not disabled. If the claimant does not have a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ compares the claimant's impairment with a listing of severe impairments (the "Listing"). *See* 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant's impairment is included in the Listing, then the claimant is disabled. The ALJ will also find a claimant disabled if the claimant's impairment or combination of impairments equals the severity of a listed impairment. If a claimant's impairment does not equal a listed impairment, then the ALJ proceeds to step four.

At step four, the ALJ must assess the claimant's residual function capacity ("RFC"). An RFC is "the most [a person] can still do despite [that person's] limitations" caused by that person's impairments and related symptoms. 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is "work that [a person] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the person] to learn how to do it." 20 C.F.R. § 404.11560(b)(1). If the claimant is able to perform past relevant work, then the ALJ finds that the claimant is not disabled. If the claimant is unable to perform past relevant work, then the ALJ proceeds to step five.

At step five, the burden shifts from the claimant to the Commissioner. *Johnson v. Chater*, 101 F.3d 178, 180 (9th Cir. 1997). The Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her

identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999). If the Commissioner is able to identify such work, then the claimant is not disabled. If the Commissioner is unable to do so, then the claimant is disabled. 20 C.F.R. § 404.1520(g)(1).

### 2. Supplemental Rules for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process. *See* 20 C.F.R. § 404.1520a. First, the Commissioner must determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment. 20 C.F.R. § 404.1520a(d). If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the evaluation proceeds to step four of the general disability inquiry. *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria). *See* 20 C.F.R. pt. 404, subpt. P, app. 1 at 12.00. Therefore, any medically determinable mental impairment – i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments – is sufficiently severe to render a claimant disabled if it satisfies the general Paragraph B criteria, which required at the time of the ALJ's decision that the claimant has at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *See id.* A "marked" limitation was defined as one that is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *See id.*

### E.    The ALJ's Decision

At the first two steps, the ALJ determined that Robinson had not engaged in substantial gainful activity since the date of his application, and that he "has the following severe impairments: human immunodeficiency virus (HIV); drug and alcohol abuse in early remission; depression[;] and hepatitis C." *Id.* at 23.

Turning to the third step of the analysis, the ALJ compared Robinson's impairments of HIV and depression to Listings 14.08 and 12.04, respectively. *Id.* With respect to the former, the ALJ stated only that "there is insufficient evidence to satisfy the pertinent requirements under 14.08, HIV infection." *Id.* With respect to Listing 12.04, the ALJ determined that Robinson did not meet the Paragraph B criteria because his limitations were mild with respect to activities of daily living, moderate with respect to social functioning, and moderate with respect to concentration, persistence, or pace, and that he had no extended episodes of decompensation. *Id.* at 23–24. The ALJ noted Robinson's ability to do some household chores and "to live with friends and, more recently, with his girlfriend" as evidence that his limitations were not more severe. *Id.* at 24. The ALJ also determined that Robinson did not meet the Paragraph C criteria because although the "record reflects a history of depressive symptoms for at least two (2) years," Robinson did not have a history of decompensation or "inability to function outside of a highly supportive living arrangement," nor evidence of "marginal adjustment such that even a minimal increase in mental demands or change in environment would be predicted to cause [him] to decompensate." *Id.*

At the fourth step, the ALJ determined that Robinson "has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he is able to stand and walk up to four hours, and he is limited to simple routine work with no more than occasional contact with coworkers and the public." *Id.*

In evaluating Robinson's RFC, the ALJ acknowledged Robinson's testimony "that he has been unable to work because of symptoms of his [HIV] infections, pain issues, fatigue, and breathing," as well as testimony that he experiences difficulty standing, "depression, loss of interest in activities he used to enjoy, changes in appetite, poor sleep, less energy, and isolation."

14

*Id.* at 25 (brackets in original, although this portion of the ALJ's opinion does not appear to be quoting any other source). The ALJ also noted Robinson's testimony that he lived with a friend (who did most household chores) and that he used heroin and marijuana within weeks before the hearing. *Id.* The ALJ held that although Robinson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his testimony regarding "the intensity, persistence and limiting effects of these symptoms" was "not entirely credible" based on noncompliance with treatment and medication, admitted use of alcohol and heroin (which the ALJ concluded would interfere with treatment), and what the ALJ characterized as contradictory statements about drug use to Drs. Van Gaasbeek and Tang. *Id.* at 25, 27.

Instead, the ALJ interpreted the medical evidence as showing that Robinson's "condition improves considerably with treatment" and that Robinson "has been persistently noncompliant with treatment." *Id.* at 25. The ALJ noted that Robinson had been diagnosed with HIV in approximately 2000, and "received brief and intermittent treatment" at an AIDS clinic in 2009, at which time Robinson's condition was poor: he was using heroin, his CD4 levels were low, he was not taking medication, and he complained of suicidal ideation. *Id.* By the end of 2009, however, the ALJ noted that Robinson's condition improved—specifically, his mood stabilized and he no longer thought about suicide—when he stopped using heroin and alcohol and entered a drug treatment program, although his viral load remained high. *Id.*

According to the ALJ, the only indication of Robinson's condition from around January of 2010 to 2012 is a reference in 2012 report to his CD4 count having been below twenty in June of 2011. *Id.* at 26. The ALJ acknowledged that Robinson "underwent several admissions for osteomyelitis and skin lesions associated with his disease" and exhibited abnormal viral load and CD4 counts from 2012 to 2014, leading his medical providers to resume Robinson's antiretroviral treatment and place him on "lifelong antibiotics." *Id.* The ALJ concluded that "[w]ith treatment, even briefly, [Robinson's] condition improved," but she stated that his viral load and CD4 levels had not improved significantly because he did not take his medication consistently. *Id.* She also determined that although Robinson's "mental health treatment has been minimal" and Robinson did not take medication regularly, his depression similarly improved in those instances where he

15

took medication.  *Id.*

The ALJ noted that Robinson's hepatitis C has generally been asymptomatic, although she acknowledged recent elevated liver functions, and that "evaluation and treatment of his [hepatitis] has been consistently deferred until he has demonstrated consistent compliance with his antiretroviral treatment."  *Id.*

In reaching these conclusions, the ALJ "place[d] great weight on" the state agency consultants' opinions that Robinson "was capable of less than light work with moderate limitations in social interaction and in concentration, persistence, and pace," which the ALJ determined was not contradicted by "additional records available at the hearing level."  *Id.*  She also "place[d] significant weight" on the opinions of the doctors who examined Robinson, Drs. Van Gaasbeek and Tang, which the ALJ characterized as assessing at most mild limitations and as "consistent with the clinical records indicating that, with treatment, [Robinson] has been able to realize some improvements in his condition."  *Id.* at 27.  The ALJ cited "clinical records at Highland Hospital, C.A.R.E.S. clinic, and AIC Fairmont Clinic" as supporting her assessment of Robinson's RFC.  *Id.*

Finally, the ALJ credited the VE's testimony that work would be available for someone with the RFC that she had assessed (which corresponded to the first hypothetical that she presented to the VE at the hearing) and therefore found Robinson to be not disabled.  *Id.* at 28.

### F.    Supplemental Evidence and Appeals Council Decision

After the ALJ denied his application for benefits, Robinson attempted to submit to the Appeals Council two questionnaires completed by "F. Thomson, RN" of the Alameda Health System, dated February 3, 2016 (collectively, the "HIV Questionnaire").  *See* Pl.'s Mot. (dkt. 19) app. 1.  Thomson checked boxes indicating that Robinson had the following opportunistic and indicator diseases: (1) cryptosporidiosis, isosporiasis, or microsporidiosis with diarrhea lasting for one month or longer; (2) herpes simplex virus causing infection for one month or longer or infecting a site other than skin or mucus membrane; (3) conditions of the skin or mucus membrane with extensive fungating or ulcerating lesions not responding to treatment; (4) granulocytopenia meeting certain conditions; (5) HIV wasting syndrome; (6) diarrhea lasting one month or longer,

United States District Court
Northern District of California

not responding to treatment, and requiring intravenous hydration or similar therapy; and

(7) endocarditis and sinusitis infections resistant to treatment or requiring intravenous treatment or

hospitalization three or more times in one year. *Id.* at 2–3.[5] Thomson stated that Robinson had

marked restrictions of activities of daily living, social functioning, and concentration, persistence,

or pace. *Id.* at 4. Thomson noted that Robinson had been hospitalized four times in 2015 with a

number of comorbidities, that one of his fingers had been amputated, and that despite

homelessness, he was adherent to medication, well-engaged with care, and, according to

Robinson, his "substance use disorder has been in remission for approx[imately] 1 year." *Id.*

Thomson also assessed Robinson as having various significant restrictions in lifting, standing,

walking, sitting, and other physical activities, and stated that he should avoid all exposure to

fumes, odors, dusts, gases, poor ventilation, extreme cold, and hazards such as machinery and

heights. *Id.* at 5–7. Thomson also checked a box indicating that Robinson's impairments would

cause him to be absent from work more than three times per month. *Id.* at 7.

     The Appeals Council "found no reason under [its] rules to review the [ALJ's] decision,"

and denied Robinson's request for review. AR at 1. The Appeals Council declined to consider the

new evidence from Nurse Thomson on the basis that it related to a later time period than the ALJ's

November 17, 2014 decision, and instructed Robinson that he would need to file a new application

if he wanted the Commissioner to consider whether he was disabled after that date. *Id.* at 2.

### G. The Parties' Arguments

#### 1. Robinson's Motion for Summary Judgment

     Robinson argues that the ALJ erred in: (1) finding that his impairments did not meet a

listing, Pl.'s Mot. at 3–9; (2) failing to include limitations caused by his mental impairment in his

RFC, *id.* at 9–11; (3) evaluating Robinson's compliance with treatment, *id.* at 12–15; and (4)

finding Robinson to be less than fully credible, *id.* at 18–19. He also argues that the Appeals

Council erred in determining that the HIV Questionnaire did not relate to the time period at issue.

*Id.* at 15–17.

---

[5] Citations to the HIV Questionnaire refer to the page numbers preceded by "Appendix-" at the bottom of each page, not to the separate paginations of the two documents included therein.

Robinson contends that the ALJ's "boilerplate findings that [Robinson's] impairments do not meet a listing"—specifically, her conclusory statement that there is no evidence to support Listing 14.08, her failure to consider the Paragraph A standard for Listing 12.04, and her brief discussion of the criteria under Paragraph B—are insufficient under Ninth Circuit precedent. *Id.* at 3–4 (citing, *e.g.*, *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001)). He argues that a diagnosis of aspergillosis in March of 2013 satisfies Listing 14.08(B), that repeated medical reports of ulcers and sores satisfy Listing 14.08(F), that repeated hospitalizations involving sepsis, pneumonia, and endocarditis satisfy Listing 14.08(J), and that various other symptoms satisfy Listing 14.08(K). *Id.* at 4–7. As for Listing 12.04, Robinson argues that there is evidence that relates to the Paragraph A criteria that the ALJ failed to address, but although he also argues that the ALJ's "boilerplate findings" regarding the Paragraph B criteria are insufficient, he does not identify any evidence establishing that he meets those criteria. *Id.* at 8–9.

With respect to that ALJ's RFC assessment, Robinson argues that the ALJ failed to account for Dr. Van Gaasbeek's conclusions regarding "Robinson's abilities to maintain regular attendance, complete a normal workday or deal with unusual stress." *Id.* at 10–11. Robinson also notes the VE's testimony that certain patterns of absences would prevent a person with the limitations presented by the ALJ from being able to work. *Id.* at 11.

As for Robinson's compliance with treatment, Robinson cites Ninth Circuit authority addressing noncompliance caused by poverty or mental health issues, as well as a Social Security Ruling that looks to whether there has been "'refusal to follow prescribed treatment'" and whether treatment is available and affordable. *Id.* at 12–13 (quoting Soc. Sec. Ruling ("SSR") 82-59). Robinson argues that the record does not support a conclusion that he "refused" treatment, and that the ALJ erred by faulting his noncompliance without considering his mental health and poverty. *Id.* at 13–15.

Robinson contends that the ALJ erred in discrediting his testimony regarding the extent of his symptoms because she failed to provide "'clear and convincing'" reasons to do so. *Id.* at 18–19 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)). Robinson disputes the ALJ's conclusion that his reports of drug use to Drs. Tang and Van Gaasbeek were contradictory, noting

18

that Dr. Tang's report that Robinson had been clean for three years was limited to intravenous drug use, and Dr. Van Gaasbeek's report of more recent heroin use did not indicate intravenous use. *Id.* at 18–19.

Finally, Robinson argues that although the HIV Questionnaire from Nurse Thomson that Robinson presented to the Appeals Council postdated his hearing by more than a year, Nurse Thomson's opinion "is reasonably related to the time period adjudicated" because some of Thomson's diagnoses were similar to those stated in Robinson's earlier hospital records, the HIV Questionnaire reflects "the first time a treating source was specifically responded [sic] about [Robinson's] disabling conditions," and Thomson had access to Robinson's earlier records. *Id.* at 16–17. Robinson therefore contends that the Appeals Council erred in failing to consider that document. *Id.* at 15–17.

## 2. The Commissioner's Cross-Motion for Summary Judgment

The Commissioner contends that the ALJ's decision is supported by substantial evidence and should be affirmed. *See generally* Comm'r's Mot. (dkt. 22). Starting with Robinson's contention that he satisfies at least one prong of Listing 14.08, the Commissioner argues that he does not satisfy Listing 14.08(B)(1) because the purported diagnosis of aspergillosis on which Robinson relies was in fact only one possibility included in an unconfirmed differential diagnosis, and was accompanied by a note that preliminary findings included no evidence of a fungal infection. *Id.* at 3. The Commissioner contends that Robinson does not meet Listing 14.08(F), which describes lesions that do not respond to treatment, because Robinson's lesions responded to treatment. *Id.* at 3–4. As for Listing 14.08(J), the Commissioner argues that Robinson was only hospitalized once for endocarditis, and thus does not meet the listing's requirement that one of the specified conditions was resistant to treatment or required three or more hospitalizations or intravenous treatments within a year. *Id.* at 4–5. The Commissioner contends that Robinson lacked "marked" restrictions in any of the categories required for Listing 14.08(K). *Id.* at 5. According to the Commissioner, it was not necessary for the ALJ to discuss the criteria for Listing 14.08 explicitly in her decision. *Id.* (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990)).

With respect to Listing 12.04, the Commissioner argues that the ALJ did not need to address the Paragraph A criteria because the Listing requires that *both* Paragraph A *and* either Paragraph B or C be satisfied, and since the ALJ determined that Robinson did not meet the criteria of Paragraphs B or C, whether he satisfied Paragraph A was not relevant. *Id.* at 5. The Commissioner contends that the ALJ sufficiently explained her assessment of the Paragraph B criteria, which is consistent with the medical opinion evidence that Robinson had no more than moderate limitations in those categories, and the Commissioner notes that Robinson does not challenge the ALJ's conclusion regarding Paragraph C. *Id.* at 6. As for the effects of Robinson's mental impairments on his RFC, the Commissioner argues that the ALJ properly translated medical assessments of impairments to a determination of vocational ability, and that the RFC of "simple work with limited contact with others" sufficiently accounts for Robinson's "mild to moderate limitations." *Id.* at 6–8.

In defending the ALJ's determination that Robinson was less than fully credible, the Commissioner argues that "Congress expressly prohibits granting disability benefits based on a claimant's subjective complaints," and that evidence of Robinson's noncompliance with treatment and improvement with medication support the ALJ's credibility assessment. *Id.* at 8–10. The Commissioner does not address the purported contradiction regarding Robinson's drug use that the ALJ cited as a reason for discrediting him, but asserts generally that "if the Court were to find that the ALJ erred in considering some of these factors during his [sic[6]] credibility analysis, such an error would be harmless because the ALJ provided additional specific, independent, and well supported bases for discounting [Robinson's] allegations." *Id.* at 10 (citing *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162–63 (9th Cir. 2008)).

Finally, the Commissioner argues that the Appeals Council properly declined to consider the HIV Questionnaire because it was dated fourteen months after the ALJ's decision and

---

[6] Both parties' briefs struggle with the use of gendered pronouns. The Commissioner consistently refers to ALJ Nancy Lisewski with masculine pronouns, and Robinson consistently refers to Acting Commissioner Nancy Berryhill with masculine pronouns. The Commissioner also consistently uses "Ms. Thomson" to refer to a nurse who is listed on the HIV Questionnaire only as "F Thomson," when there appears to be no basis in the record to determine the gender of that nurse, and Robinson consistently misspells the nurse's name as "Thompson."

concerned hospitalizations and tests that occurred after the decision. *Id.* at 10–11 (citing 20 C.F.R. § 416.1470 for the proposition that the Appeals Council need not consider evidence that does not relate to the relevant time period). The Commissioner also notes that there is no evidence that the nurse who prepared the HIV Questionnaire treated Robinson during the time period at issue, and that the nurse therefore should not be considered a treating source. *Id.* at 11.

### 3. Robinson's Reply

In his reply brief, Robinson renews his argument that the ALJ erred in finding that he did not meet or equal a listed impairment, focusing on the brevity of the ALJ's consideration of that issue and on Listings 14.08(F), 14.08(J), and 14.08(K). Reply (dkt. 25) at 1–5. Robinson also argues again that the ALJ's erred in her analysis of his RFC and credibility, *id.* at 5–10, and that the Appeals Council should have considered, and the Court should now consider, the HIV Questionnaire completed by Nurse Thomson. *Id.* at 10–13.

## III. ANALYSIS

### A. Legal Standard

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider "both the evidence that supports and the evidence that detracts from the

21

1  Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones*

2  *v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

3        Although the Court may "review only the reasons provided by the ALJ in the disability

4  determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely,"

5  *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014), "harmless error analysis applies in the

6  social security context." *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015). "But where the

7  circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that

8  the agency can decide whether re-consideration is necessary. By contrast, where harmlessness is

9  clear and not a borderline question, remand for reconsideration is not appropriate." *McLeod v.*

10 *Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (footnotes, citations, and internal quotation marks

11 omitted).

12       If the Court identifies defects in the administrative proceeding or the ALJ's conclusions,

13 the Court may remand for further proceedings or for a calculation of benefits. *See Garrison*, 759

14 F.3d at 1019–21.

15       **B.    The ALJ Erred in Failing to Meaningfully Evaluate Listing 14.08**

16       "An ALJ must evaluate the relevant evidence before concluding that a claimant's

17 impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to

18 support a conclusion that a claimant's impairment does not do so." *Lewis v. Apfel*, 236 F.3d 503,

19 512 (9th Cir. 2001). "[I]n determining whether a claimant equals a listing under step three of the

20 Secretary's disability evaluation process, the ALJ must explain adequately his evaluation of

21 alternative tests and the combined effects of the impairments." *Marcia v. Sullivan*, 900 F.2d 172,

22 176 (9th Cir. 1990). That being said, an "ALJ is not required to discuss the combined effects of a

23 claimant's impairments or compare them to any listing in an equivalency determination, unless the

24 claimant presents evidence in an effort to establish equivalence." *Burch v. Barnhart*, 400 F.3d

25 676, 683 (9th Cir. 2005). Here, however, Robinson presented such evidence to the ALJ in his pre-

26 hearing brief and his arguments at the hearing, arguing that his AIDS-related symptoms were

27 sufficient to meet multiple subparts of Listing 14.08. *See* AR at 39–40, 341–44.

28       Despite Robinson's arguments that he met specific subparts of Listing 14.08 and the

22

extensive medical records regarding treatment for AIDS-related symptoms, the ALJ's analysis of Listing 14.08 reads, in full, as follows:

> I considered whether the claimant's impairments meet or medically equal any of the listings, individually or in combination, and I find that there is insufficient evidence to satisfy the pertinent requirements under 14.08, HIV infection.

*Id.* at 23. This is type of "boilerplate finding is insufficient" under Ninth Circuit law. *See Lewis*, 236 F.3d at 512. The ALJ's failure to meaningfully discuss Listing 14.08 has resulted in both parties asking this Court essentially to review Robinson's medical records in the first instance to determine whether Listing 14.08 applies, *see, e.g.*, Pl.'s Mot. at 3–9; Comm'r's Mot. at 3–5, rather than review the ALJ's analysis as contemplated by the statutory and regulatory framework.

There is evidence in the record relevant to at least some of the subparts of Listing 14.08 on which Robinson relies. For example, Listing 14.08(F), at the time of the ALJ's decision, required skin conditions with "extensive fungating or ulcerating lesions not responding to treatment." Robinson was repeatedly hospitalized with fungal and ulcerating lesions, and at least one discharge report—after three successive admissions in a two-month period—states that Robinson's "skin ulcers are not improving with current medication." AR at 537. Another treatment note indicated that Robinson's lesions worsened while he was on intravenous medication. *Id.* at 646. The ALJ states in her RFC assessment that Robinson's condition responded to treatment, but it is not clear from her decision that she considered the evidence to the contrary. *See id.* at 26. As another example, Listing 14.08(B) required one of several listed fungal infections, including aspergillosis. There are at least suggestions of aspergillosis in Robinson's medical records. *Id.* at 534, 804. The Commissioner now argues that those diagnoses were not confirmed, but the ALJ is in a better position than this Court to interpret that medical evidence in the first instance, and there is no indication that the ALJ did so here. Listing 14.08(J) required one of several infections—including sepsis, endocarditis, and sinusitis—that "must either be resistant to treatment or require hospitalization or intravenous treatment three or more times in a 12-month period." There is some evidence, not discussed by the ALJ, of endocarditis and sinusitis, as well as septic emboli. AR at 357–58, 381, 392, 525, 552. Robinson was also hospitalized three times

23

in a two-month period in early 2013, and six or seven times in the twelve month period from mid-March of 2012 through mid-March of 2013.  AR at 357, 528,537, 539, 541, 543.[7]  The ALJ is better suited than this Court to determine in the first instance how those hospitalizations related to the infections required for Listing 14.08(J), as well as whether such frequent hospitalizations for *other* AIDS-related infections and symptoms would be medically equivalent to Listing 14.08(J).

Faced with similarly deficient analysis by ALJs, courts have remanded for further administrative proceedings because the ALJ "is in a better position to evaluate the medical evidence" than a district court.  *Santiago v. Barnhart*, 278 F. Supp. 2d 1049, 1058 (N.D. Cal. 2003); *see also, e.g.*, *Galaspi-Bey v. Barnhart*, No. C-01-01770-BZ, 2002 WL 31928500, at *3 (N.D. Cal. Dec. 23, 2002).[8]  On remand, the ALJ should specifically consider and discuss whether Robinson's impairments meet or equal a listing related to AIDS or HIV.  Because the parties have not addressed the recent amendments to the relevant listings, the Court declines to address that issue sua sponte, and the ALJ should also consider the significance of those amendments on remand.

### C.    Any Error Related to Listing 12.04 Was Harmless

Robinson also argues that the ALJ erred in providing only a conclusory analysis of the Paragraph B criteria for Listing 12.04 and in not addressing the Paragraph A criteria.  *See* Pl.'s Mot. at 8–9; Reply at 5–6.  The Paragraph B criteria, at the time of the ALJ's decision, required at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration;

---

[7] Robinson was admitted from February 23 to March 21, 2012, AR at 357, admitted in early July of 2012 at Eden Medical Center, as discussed in subsequent Highland Hospital records, *id.* at 528, treated at the emergency room (but possibly not admitted) in mid-July of 2012, *id.*, admitted from November 5 to 8, 2012, *id* at 543, admitted from February 21 to 28, 2013, *id.* at 541, admitted from March 9 to 10, 2013, *id.* at 539, and admitted from March 15 to April 11, 2013, *id.* at 537.
[8] Other courts have similarly held that an ALJ's failure to discuss specific listings was error, but remanded for an award of benefits because other evidence in the record warranted that result under the Ninth Circuit's credit-as-true rule.  *E.g.*, *Homme v. Colvin*, No. 15-CV-00135-EDL, 2016 WL 5898647, at *10, *14 (N.D. Cal. Feb. 26, 2016); *Manzo v. Soc. Sec. Admin.*, No. CV-10-1062-HZ, 2011 WL 4828818, at *12–13 (D. Or. Oct. 11, 2011).

20 C.F.R. § 404 subpt. P, app. 1 (as applicable at the time of the decision).

In assessing the Paragraph B criteria, the ALJ determined that Robinson had mild restrictions in activities of daily living, moderate difficulties with social functioning, moderate difficulties with concentration, persistence, or pace, and no episodes of decompensation. AR at 24. That assessment is identical to the opinions of the consultants who reviewed Robinson's applications, Drs. Morando and Singh, *id.* at 80, 94, and generally consistent with Dr. Van Gaasbeek's determinations after he examined Robinson in 2012, *id.* at 496. The only evidence that Robinson cited to the ALJ with respect to the Paragraph B criteria was Dr. Van Gaasbeek's note that Robinson had "concentration problems and thus needed to have questions repeated to him." *Id.* at 494 (Dr. Van Gaasbeek's report); *see id.* at 345 (Robinson's pre-hearing brief). Robinson's brief to the ALJ omitted the word "mild" from Dr. Van Gaasbeek's report. *See id.* at 494 ("The claimant had some mild concentration problems and thus needed . . . ."). Dr. Van Gaasbeek also characterized Robinson's concentration, persistence, and pace as "[a]dequate," assessed his concentration as "[f]air," and in the context of a functional assessment, did not characterize any category of impairment as worse than "moderate." *Id.* at 494–96.

Unlike his arguments regarding Listing 14.08 discussed above, Robinson's briefs to the Court cite no evidence regarding Listing 12.04, *see* Pl.'s Mot. at 8–9; Reply at 5–6, his attorney did not address the requirements of that listing at the administrative hearing, *see* AR at 39–40, and the brief reference to an assessment of "mild" concentration problems in his brief to the ALJ, *see* AR at 345, does not demonstrate "[m]arked difficulties in maintaining concentration, persistence, or pace," much less a second "marked" restriction or extended decompensation as required under Paragraph B. In the absence of any evidence suggesting that Robinson satisfied Listing 12.04, the Court concludes that any error in the ALJ's relatively brief discussion of the issue was harmless.[9]

---

[9] Accepting the ALJ's determination that Robinson did not satisfy the criteria of Paragraph B (as discussed above) or Paragraph C (which Robinson does not challenge here), the ALJ's failure to consider the Paragraph A criteria was not error, because Robinson could not meet Listing 12.04 without establishing that he met one of the other paragraphs *in addition to* Paragraph A. Whether Robinson's mental impairment satisfied Paragraph A is irrelevant in light of the ALJ's conclusion that it did not satisfy either of the other paragraphs.

**D.     The ALJ Erred as to Robinson's Credibility and Treatment Noncompliance**

Although the ALJ is responsible for evaluating credibility, the Ninth Circuit has formulated a two-step test for considering a claimant's testimony regarding the severity of subjective symptoms:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." *Id.*; *see also Reddick*, 157 F.3d at 722 ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").
>
> Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *see also Robbins* [*v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)] ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).[10]

The ALJ found that Robinson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" and did not determine that Robinson was malingering. AR at 25. The ALJ was therefore required to "offer[] specific, clear and convincing reasons" to reject Robinson's testimony regarding the severity of his symptoms. *See Smolen*, 80 F.3d at 1281. The only specific reasons that the ALJ presented for discounting Robinson's testimony were: (1) that he was noncompliant with treatment; (2) that he "admitted to using alcohol and heroin which would certainly and adversely affect his skin conditions and any potential treatment for

---

[10] The Commissioner here states an objection for the record to the Ninth Circuit's "clear and convincing" standard, but recognizes that this Court is bound by Ninth Circuit authority. Comm'r's Mot. at 9 n.3.

hepatitis C"; and (3) that he "has not been forthright about his drug use," having "reported that he had been clean for two week" to Dr. Van Gaasbeek and, in contrast, "that he had been clean for three years" to Dr. Tang. AR at 27. Of these reasons, the only one that the Commissioner pursues here is that Robinson was noncompliant with treatment and, relatedly, that his condition improved when he took his medication as advised. *See* Comm'r's Mot. at 8–10.

The ALJ is correct that Robinson's medical records include indications of faulty compliance with treatment. *See, e.g.*, AR at 546 ("The patient was previously on HAART, but stopped secondary to compliance issues, the patient is now willing to give it another try."); *id.* at 804 ("He has not been taking his HIV medications reliably."). It is worth noting that Robinson's medical conditions themselves sometimes interfered with his ability to receive treatment. *E.g.*, *id.* at 546 ("We will wait to start HAART treatment till after the infection clears, this could be started as an outpatient."). It is also true, as noted by the Commissioner, that "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" is among the factors that an ALJ can consider in assessing credibility, *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), and that "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits," *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). *See* Comm'r's Mot. at 9. That rule is not, however, absolute. "[B]enefits may not be denied to a disabled claimant because of a failure to obtain treatment that the claimant cannot afford," *Warre*, 439 F.3d at 1006, and the Ninth Circuit disfavors faulting claimants where failure to obtain treatment is itself caused by a mental impairment, *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999) ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." (citation omitted)). The record here is replete with evidence that Robinson suffered from both poverty and at least some degree of mental impairment. The ALJ erred in failing to consider whether his failure to comply with treatment regimens consistently was excusable under relevant law.

Moreover, the Commissioner's own interpretation of the governing statutes and regulations states that the Commissioner "may make a determination that an individual has failed to follow

prescribed treatment only where . . . there has been a *refusal* to follow prescribed treatment." SSR

82-59 (emphasis added). The ALJ made no finding that Robinson *refused* treatment in this case.

The Commissioner's ruling also emphasizes the importance of allowing a claimant to explain any

failure to follow prescribed treatment:

> The claimant or beneficiary should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal. The record must reflect as clearly and accurately as possible the claimant's or beneficiary's reason(s) for failing to follow the prescribed treatment.
>
> Individuals should be asked to describe whether they understand the nature of the treatment and the probable course of the medical condition (prognosis) with and without the treatment prescribed. The individuals should be encouraged to express in their own words why the recommended treatment has not been followed. They should be made aware that the information supplied will be used in deciding the disability claim and that, because of the requirements of the law, continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits. Particular care should be taken to avoid any impression that SSA is attempting to influence the individual's decision. No statements should be made which could be construed in any way as interference with the doctor-patient relationship.

SSR 82-59. Here, the ALJ only questioned Robinson for approximately three minutes.[11] The ALJ

did not ask Robinson any questions about why he sometimes failed to comply with his prescribed

treatment. *See* AR at 40–42. The record does not "clearly and accurately" reflect Robinson's

"reason(s) for failing to follow the prescribed treatment." *Cf.* SSR 82-59. To the extent that the

ALJ relied on Robinson's noncompliance to hold that he was not disabled because his

impairments would have resolved with treatment, the ALJ erred in failing to comply with SSR 82-

59.

Considering noncompliance with treatment in the context of a credibility determination—

as opposed to the context of whether a condition should be considered disabling—is a somewhat

different question, and the Ninth Circuit has held that an ALJ need not follow SSR 82-59 in

evaluating credibility. *Molina v. Astrue*, 674 F.3d 1104, 1114 n.6 (9th Cir. 2012). Even so, under

_____

[11] The hearing lasted 43 minutes, and the ALJ's questioning of Robinson takes up 2.5 pages of a 35.5 page transcript, or approximately 7% of the hearing. *See* AR at 37–72.

the circumstances of this case, Robinson's failure to follow prescribed treatment consistently was not a clear and convincing reason to reject his testimony. For one thing, the Commissioner cites no authority holding that noncompliance is *in itself* sufficient to discredit a claimant's symptom testimony, without other factors also supporting such a determination. *Cf. Tommasetti*, 533 F.3d at 1039–40 (citing, among several other factors, the claimant's own "testimony that his severe diabetes was not a 'disabling problem,' was controlled by medication, and was not the reason he stopped working," which contradicted his claim of disability). This is also not a case where the consequences of failing to follow treatment are in dispute. In *Tommasetti* and cases cited therein, ALJs permissibly questioned the severity of pain testimony where claimants did not seek aggressive treatment for the purported pain. *See id.* at 1039–40. Here, when Robinson did not take all of his prescribed medication, he repeatedly ended up hospitalized—sometimes for extended periods of time and subject to invasive procedures. *See, e.g.*, AR at 544, 691. Whatever reason Robinson may have had for "slipping" on his treatment, the record does not permit an inference that his impairment was not so severe as to require such treatment, as in most cases where a claimant's noncompliance has supported an adverse credibility determination. The ALJ erred in holding to the contrary.

The Court focuses on the argument above that the Commissioner has elected to pursue in her motion, but to briefly address one of the ALJ's other reasons for her adverse credibility determination, it is worth noting that Robinson's statements to Dr. Van Gaasbeek and Dr. Tang were not, in fact, inconsistent. Dr. Tang described Robinson as "clean three years off IV drug use" with some continued use of marijuana and alcohol. AR at 497. Dr. Van Gaasbeek discussed Robinson's use of heroin and past experimentation with cocaine, and stated that Robinson reported having "been clean for two weeks." *Id.* at 494. The distinction between intravenous and non-intravenous heroin use appears throughout Robinson's medical records, including on at least one page cited by the ALJ in her discussion of Robinson's drug use, from a hospital report dated approximately six weeks before Robinson saw Drs. Tang and Van Gaasbeek. *See id.* at 26 (ALJ's decision, citing Ex. 7F at 6 (AR at 528)); *id.* at 528 ("heroin idu [i.e., intravenous drug use] (states no idu x 'a couple of years' only snorting heroin occasionally now)"). Because the three years at

issue in Dr. Tang's report concerned only intravenous drug use, as opposed to Dr. Van Gaasbeek's more general report that Robinson had been "clean for two weeks," there is no conflict between the two reports sufficient to discredit Robinson's testimony, and the ALJ erred in concluding otherwise. The Court declines to address sua sponte and without the benefit of briefing whether Robinson's drug use itself, rather than any purported inconsistency in how he described such use, could support the ALJ's adverse credibility finding. *See* Comm'r's Mot. at 8–10 (failing to address that issue in discussing the question of Robinson's credibility).

### E. The ALJ Erred in Assessing Robinson's RFC

The ALJ determined that Robinson had "the residual functional capacity to perform light work as defined in 20 CFR 416.97(b) except that he is able to stand and walk up to four hours, and he is limited to simple routine work with no more than occasional contact with coworkers and the public." AR at 24. The VE testified that jobs would be available for a person with those limitations. *Id.* at 68–69. In response to questions from Robinson's attorney, the VE testified that various patterns of required absence from work would affect the ability of such a person to hold a job. *Id.* at 70.

The ALJ's decision did not sufficiently address evidence that Robinson would be limited in attendance. The ALJ "place[d] great weight on the opinion by the state agency medical and psychological consultants who opined that that the claimant was capable of less than light work with moderate limitations in social interaction and in concentration, persistence, and pace," *id.* at 26, but failed to address the consultants' determinations that Robinson would also be "[m]oderately limited" in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," *see id.* at 83, 97. Dr. Van Gaasbeek also assessed Robinson's "ability to maintain regular attendance in the workplace" as "mildly to moderately impaired." *Id.* at 496. An ALJ has some degree of discretion in translating physical and mental impairments into vocational restrictions, and may permissibly account for an impairment generally related to concentration, persistence, or pace with a restriction to simple and routine work. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008). Here,

30

however, the ALJ's RFC assessment did not reflect the consultants' determinations that Robinson's psychological symptoms could cause "interruptions" to a "normal workday and workweek" or require "an unreasonable number and length of rest periods," or Dr. Van Gaasbeek's assessment that he be mildly to moderately impaired with respect to attendance. *See* AR at 83, 97, 496. The ALJ erred in failing either to include limitations relating to absences and/or rest breaks or to explain why she disregarded that limitation assessed by these consulting and examining doctors.

It is a closer call whether the ALJ erred in failing to take into account absences caused by AIDS-related hospitalizations—assuming, counterfactually, that the ALJ had developed a record of the reasons Robinson did not comply with treatment sufficient to disregard impairments that are amenable to treatment. There is certainly evidence that Robinson's symptoms improved with medication and that his worst infections followed periods of noncompliance, *see, e.g.*, AR at 810, 818, 820, and it is primarily the ALJ's role to interpret medical evidence. On the other hand, neither the ALJ nor any medical source explicitly addressed whether someone with Robinson's conditions, who required at least ten hospital admissions from June of 2011 through August of 2014,[12] could be expected not to miss any time at all from work due to AIDS-related symptoms if he took his medication as prescribed. The Court does not reach the question of whether the failure to include AIDS-related absence in Robinson's RFC was error, but encourages the Commissioner to consider this issue on remand.

### F.    Nurse Thomson's Report

The Appeals Council declined to consider the 2016 HIV Questionnaire from Nurse F. Thomson on the basis that it postdated the ALJ's decision by more than a year and did not relate to the time period considered by the ALJ. AR at 2. Robinson argues that the Court should consider the HIV Questionnaire because it is part of the administrative record and because it "directly relates to the adjudicated time period," arguing that Thomson is a "treating source remarking on the entirety of the relevant period" and "has a unique understanding, ability and duty to review

---

[12] *See* AR at 357, 528, 537, 539, 541, 543, 646, 674, 738.

[Robinson's] longitudinal record." Reply at 10–11.

Robinson's first argument is incorrect. The HIV Questionnaire is not part of the administrative record; the Appeals Council determined that it was immaterial and declined to consider it. AR at 2 ("This new information is about a later time. Therefore, it does not affect the decision . . . ."); *see generally* AR (omitting the HIV Questionnaire); *cf. Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1164 (9th Cir. 2012) ("Here, the Appeals Council accepted Brewes' proffered new evidence and *made it part of the record*, apparently *concluding that it was material* within the meaning of 20 C.F.R. § 404.970(b)." (emphasis added)). For the Court to consider the evidence now, Robinson would therefore need to show that it is "material" under 42 U.S.C. § 405(g), much as he would have needed to show that it was "material" under 20 C.F.R. § 404.970 for the Appeals Council to consider it.

As for whether the HIV Questionnaire relates to the time period at issue, nothing on its face shows that it does. *See generally* Pl.'s Mot. app. 1. The only reference to a specific time period is a note that Robinson was hospitalized four times in 2015, *id.* at 4, which was after the period at issue concluded with the ALJ's decision in 2014. The Court therefore cannot say that the HIV Questionnaire is material to the question of whether Robinson was disabled at the time of the ALJ's decision, and holds that the Appeals Council did not err in the conclusion that it was not. Because remand is necessary for other reasons, however, and to avoid needlessly duplicative proceedings, the Commissioner should allow Robinson on remand to submit evidence that relates to time periods after the ALJ's decision, including the HIV Questionnaire.

### G. Further Proceedings Are Necessary

Robinson asks the Court to remand for an award of benefits, rather than further administrative proceedings, but does not sufficiently explain the legal basis for that request. *See* Pl.'s Mot. at 19–20 (listing the ALJ's purported errors, but failing to explain why the issues would not benefit from further proceedings); *see generally* Reply. Under the Ninth Circuit's credit-as-true rule, remand for benefits is an appropriate remedy for an ALJ's failure to properly credit claimant testimony or medical opinion evidence where:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020. Here, the record has not been fully developed, because there is insufficient evidence of the reasons for Robinson's failure to follow prescribed treatment. It is also not clear that the ALJ would be required to find Robinson disabled on remand if she credited his testimony, or if she credited the opinion evidence regarding his limitations related to breaks, interruptions, and absences, because Robinson has not articulated how any of that testimony or those opinions relate to a listed impairment or to a hypothetical presented to the VE. The Court therefore concludes that further proceedings are necessary.

## IV. CONCLUSION

For the reasons discussed above, Robinson's motion for summary judgment is GRANTED in part, the Commissioner's motion is DENIED, and the matter is REMANDED for further administrative proceedings consistent with this order. The Clerk is instructed to enter judgment in favor of Robinson and close the file.

As a final note, Robinson's inability to testify in person at his administrative hearing is concerning. The Social Security Administration appears to have been sufficiently confident in Robinson's identity to accept his testimony, but not to allow him to enter a federal government building that is open to the public (subject to security screenings and identification check). As far as this Court is aware, visitors lacking valid identification generally may enter federal buildings if accompanied by an employee escort. If a second administrative hearing is held on remand, the Commissioner is ORDERED to make arrangements for Robinson to testify in person if he chooses to do so.

**IT IS SO ORDERED.**

Dated: March 16, 2018

JOSEPH C. SPERO
Chief Magistrate Judge